IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| **Rogenia Ann Poteet**, ) | |
| ) | |
| Plaintiff, ) | CASE No. 3:13-cv-0730 |
| ) | SENIOR JUDGE NIXON |
| vs. ) | MAGISTRATE JUDGE BROWN |
| ) | |
| **Carolyn Colvin**, ) | |
| **Comm'r of Soc. Sec.** ) | |
| ) | |
| Defendant. | |

**To: The Honorable John T. Nixon, Senior United States District Judge**

## REPORT & RECOMMENDATION

This action was brought pursuant to 42 U.S.C. §§ 405(g) to obtain judicial review of the unfavorable decision of the Social Security Administration ("SSA") by the SSA Commissioner ("the Commissioner") regarding plaintiff's application for supplement disability income ("DIB") under Title XVI of the Supplemental Social Security Income Act ("SSI") 42 U.S.C. §§ 416(i), 1382(c). For the reasons explained below, the undersigned **RECOMMENDS** that the plaintiff's motion for judgment on the record be **DENIED** and the ruling of the Administrative Law Judge ("ALJ") be **AFFIRMED**.

### I. PROCEDURAL HISTORY

Rogenia Ann Poteet ("Plaintiff") initially filed for DIB under Title XVI of the Social Security Act, 42 U.S.C. § 1382(c), on July 27, 2009 alleging June 1, 1997 as the onset date. [1]

---

[1] While none of Plaintiff's prior DIB filings are included in the record, the ALJ indicates in her opinion that Plaintiff filed similar claims, which were all denied, in June of 1997, October of 2002, and August of 2008. (AR., Doc. 13, p. 11) The SSA's consideration of Plaintiff's current DIB claims does not encompass those previously determined; thus, "the principles of res judicata apply to" the Commissioner's prior determinations. *Perry v. Comm'r of Soc. Sec.*, 501 Fed. Appx. 425, 427 (6th Cir. 2012) (citing *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837, 841 (6th Cir. 1997)).

(Docket Entry 13 ("Doc."), pp. 113, 123)  Plaintiff's claim is based upon diagnoses of Human Immunodeficiency Virus ("HIV"), blood clots, deep vein thrombosis ("DVT"), hypercoagulability, cervical dysplasia, bipolar disorder with associated depression, and illiteracy. (Administrative Record ("AR."), Doc. 13, p. 129)  Plaintiff's application was denied on December 29, 2009 and again upon reconsideration on June 3, 2010.  (AR., Doc. 13, pp. 61-3, 66-7)  On July 27, 2010, Plaintiff requested a hearing before an ALJ, Renee S. Andrews.  (AR., Doc. 13, p. 71)  The hearing was conducted on January 23, 2012.  (AR., Doc. 13, p. 11)

The ALJ denied Plaintiff's application on February 21, 2012 and Plaintiff requested review of the ALJ's determination on April 19, 2012.  (AR., Doc. 13, p. 7)  The SSA Appeals Council denied review of the ALJ's determination on May 22, 2013, rendering the ALJ's decision the Commissioner's final determination at that time.  (AR., Doc. 13, p. 1)

Plaintiff brought this action in federal district court on July 25, 2013 seeking judicial review of the Commissioner's decision.  (Doc. 1)  The Commissioner filed answer and a copy of the administrative record on October 15, 2013.  (Doc. 12, 13)  On December 16, 2013, Plaintiff moved for judgment on the administrative record (Doc. 18), and the Commissioner responded on February 13, 2014.  (Doc. 22)  Plaintiff filed reply to the Commissioner's response on February 28, 2014.  (Doc. 23)

This matter is properly before the court.

## II.   THE RECORD BELOW

### A.  Medical Evidence

The medical records from Plaintiff's treating physician, Dr. Catherine McGowan, are indicative of multiple physical and mental medically diagnosable ailments.  In August of 2011, Plaintiff was admitted to the Vanderbilt Emergency department complaining of vomiting and

diarrhea. (AR., Doc. 13, pp. 300-20) She was diagnosed with the "stomach flu," given IV fluids, and discharged. (AR., Doc. 13, p. 301) One month later, Plaintiff's symptoms had resolved. (AR., Doc. 13, p. 281)

Although the record reflects a diagnosis of cervical dysplasia,[2] PAP smears performed since 2010 have consistently tested normal or negative for the condition. (AR., Doc. 13, pp. 232, 239, 241, 244, 246, 283, 331, 335) Plaintiff's hypercholesterolemia[3] is well documented in the record but is controlled with Lipitor and Zetia. (AR., Doc. 13, pp. 229, 232, 239, 241, 253, 259) Likewise, Plaintiff's peripheral neuropathy[4] is well controlled with Lyrica. (AR., Doc. 13, pp. 284, 355-6, 404-6) Although Plaintiff complained of worsening lower extremity pain in October of 2009, Dr. McGowan's notes reflect that Plaintiff, "for unclear reasons, ha[d] been off amitrip for some time."[5] (AR., Doc. 13, p. 231) While taking Lyrica, Plaintiff consistently denied joint pain, exhibited no impairment in gait, maintained a full range of motion bilaterally in her extremities, experienced no loss in strength, and showed no signs of swelling or edema. (AR., Doc. 13, pp. 228-29, 284, 321, 355-56, 404-06) Further, Plaintiff consistently reported no impairment in her activities of daily living. (AR., Doc. 13, pp. 287, 358, 411)

Although Plaintiff has been HIV positive since 1997, she was "doing well overall with excellent sustained response and adherence to ART" in July of 2011.[6] (AR., Doc. 13, p. 356)

---

[2] Defined as "cellular deviations from the normal in the epithelium of the uterine cervix, which may begin as basal cell hyperplasia and progress through more disorderly epithelial changes toward anaplasia; it is considered a precursor to carcinoma." Dorland's Illustrated Medical Dictionary 580 (32d Ed. 2012).

[3] Defined as "excessive cholesterol in the blood." Dorland's Illustrated Medical Dictionary 891 (32d Ed. 2012).

[4] Defined as "a functional disturbance or pathological change in the peripheral nervous system." Dorland's Illustrated Medical Dictionary 1268-9 (32d Ed. 2012).

[5] It is presumed that "amitrip" is an abbreviation of "amitriptaline," which is also effective in treating "cases of neurotic pain disorders" such as peripheral neuropathy. *See http://en.wikipedia.org/wiki/Amitriptyline*.

[6] According to the NIH, "Antiretroviral Therapy (ART) is the use of HIV medicines to treat HIV infection." *See* When to start Antiretroviral Therapy, National Institute of Health, *available at* http://aidsinfo.nih.gov/education-materials/fact-sheets/21/52/when-to-start-antiretroviral-therapy# (last updated May 6, 2014).

According to medical records spanning December of 2010 through August 2011, Plaintiff exhibited a "history of . . . excellent CD4 counts and undetectable viral load."[7] (AR., Doc. 13, pp. 229, 232, 239, 241, 246, 248, 284-85, 291-92, 321) Additionally, while Plaintiff experienced fatigue and some "mild diarrhea," she consistently denied experiencing fever, night sweats, nausea, and vomiting. (AR., Doc. 13, pp. 281, 290-92, 355, 404)

As with her other maladies, Plaintiff's hypercoagulability[8] and DVT[9] are well controlled with Coumadin. According to the record, Plaintiff's target INR is between 2.0 and 3.0 (AR., Doc. 13, p. 347), and her INR levels consistently tested in the range of 1.7 and 3.2 from October of 2010 through September of 2011. (AR., Doc. 13, pp. 278-423) There is no indication in the record that Plaintiff experienced any detrimental symptoms from this disorder or experienced the formation of blood clots in her lower extremities. (AR., Doc. 13, pp. 278-423) Plaintiff repeatedly denied signs of easy bruising or bleeding. (AR., Doc. 13, pp. 226-28, 230, 234)

The record indicates a diagnosis of bipolar disorder with associated depression, but there is no indication when or by whom such diagnosis was made. Despite notations in Dr. McGowan's records of a referral to a mental health provider (AR., Doc. 13, p. 332), the only evidence of Plaintiff being seen by a mental health provider is an examination performed by State Agency expert Lisa N. Patterson, M.A., on October 13, 2009. (AR., Doc. 13, p. 201-06) The record also reflects that Plaintiff refused to take the medication prescribed to her to control her depression because "[i]t makes [her] feel bad." (AR., Doc. 13, p. 47) Despite her failure to

---

[7] CD4 T Lymphocyte "count is the most important laboratory indicator of immune function and the strongest predictor of HIV progression." *See* NIH Aids Info Glossary, http://aidsinfo.nih.gov/education-materials/glossary/822/cd4-count. (last updated June 12, 2014).

[8] The propensity to form blood clots. Dorland's Illustrated Medical Dictionary 376, 888 (32d Ed. 2012).

[9] Defined as "the formation, development, or presence of a thrombus . . . [in] one or more deep veins, usually of the lower limbs, characterized by swelling, warmth, and erythema." Dorland's Illustrated Medical Dictionary 1923 (32d Ed. 2012). A thrombus is "a stationary blood clot along the wall of a blood vessel. (Id.)

take these medications, Plaintiff consistently denied symptoms of depression as late as April 3, 2011. (AR., Doc. 13, pp. 281, 355, 404)

Subsequent to Plaintiff's claim to DIB, State Agency reviewing physician, Dr. James Mills, M.D., concluded that "the current medical evidence of record does not support [Plaintiff's claims of an] inability to complete an 8 hour workweek with normal breaks" from his review of Plaintiff's medical records. (AR., Doc. 13, p. 197) Central to Dr. Mills' opinion is a lack of evidence in the record to "support the alleged DVT" due to Plaintiff's "[normal] peripheral vascular exam[, and the lack of] edema in [Plaintiff's] lower extremities." (AR., Doc. 13, p. 197) Further, Dr. Mills opined that "the current file contains no evidence of cervical dysplasia[,]" Plaintiff's hypercholesterolemia is manageable with treatment, and Plaintiff's HIV is "stable" with therapy as evidenced by consistent viral load levels below 48. (AR., Doc. 13, p. 197) Dr. Mills cited to Plaintiff's ability to complete all activities of daily living without assistance as further support for his ultimate conclusion. (AR., Doc. 13, p. 197) Dr. Mills' opinion was affirmed by Dr. Glenda D. Knox-Carter, M.D., on May 31, 2010 despite Plaintiff's allegations of "worsening DVT pain." (AR., Doc. 13, p. 276)

At the request of the SSA, Plaintiff underwent a psychological evaluation on October 31, 2009. According to Lisa N. Patterson, Plaintiff is functionally illiterate but able to function in a work environment. After her examination of Plaintiff, Ms. Patterson opined that:

> Ms. Poteet's ability to understand and remember is estimated to be mildly limited. She is estimated to be functioning in the borderline range of intelligence. She reported that she is illiterate. Her ability to sustain concentration appeared adequate during testing. Her social skills appear to be within normal limits. Her adaptive skills appear to be within normal limits. Ms. Poteet does not appear to be able to manage her funds independently because she is illiterate. On the other hand, she is talented at getting people to help her out. It is recommended that a payee be appointed for her if she receives disability benefits. Her husband is helping her at this time.

(AR., Doc. 13, p. 204) This opinion was based upon Plaintiff's performance on standardized tests such as MMPI-2 Lie and Frequency Scales, 15 Item Malingering Test, Mental Status Exam, and Bender Gestalt test, which placed her Global Assessment of Functioning at 55-60.[10] (AR., Doc. 13, pp. 202-3) Further supporting Ms. Patterson's opinion is Plaintiff's ability to engage in activities of daily living unassisted. For example, Plaintiff cares for her son and grandson, helps her grandson with his homework, and maintains her household. (AR., Doc. 13, p. 204)

On December 22, 2009, Dr. Robert de la Torre, Psy. D., also a State Agency reviewer, opined that Plaintiff's medical record demonstrated moderate limitations in her ability to complete activities of daily living, maintain social functioning, and maintain concentration, persistence, and pace. (AR., Doc. 13, p. 217) According to Dr. de la Torre, Plaintiff's medical history and performance during Ms. Patterson's examination indicate that Plaintiff's "impairments would not singly or in combination prevent the claimant from completing work-like activities; however, concentration persistence and pace and social ability are somewhat impacted by the diagnoses and therefore would cause moderate limitations in basic work-like duties." (AR., Doc. 13, p. 219)

On July 29, 2011, Dr. McGowan opined that "[Plaintiff] suffers from chronic peripheral neuropathy in her legs which is painful and interferes with standing, gait, and physical stamina. She has a hypercoagulable state resulting in recurrent venous thromboembolism and requiring life-long anticoagulation (blood thinning medication). Ms. Poteet also is receiving treatment for hyperlipidemia and cervical dysplasia." (AR., Doc. 13, p. 277) According to Dr. McGowan,

---

[10] Global Assessment of Function is "a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 502 n.7 (6th Cir. 2006). A GAF score in the range of 40-50 represents serious symptoms resulting in marked difficulty, and a score in the range of 50-60 represents moderate symptoms. *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders p. 32 (4th Ed. 1994)

Plaintiff "is severely limited by her multiple chronic medical problems and [is] unable to sustain gainful employment." (AR., Doc. 13, p. 277)

**B. Plaintiff's Testimony**

Plaintiff testified that she was 46 years of age, completed the tenth grade, cannot read but can sign her own name, and relies upon her estranged husband to help her with finances. (AR., Doc. 13, pp. 30-31) She lives with her son and grandchild in a house provided to them by her estranged husband. (AR., Doc. 13, p. 31) She rarely ventures out of her home due to the pain in her legs which makes it hard to ambulate, but she does go to the mailbox and attends doctor's appointments. (AR., Doc. 13, p. 32) Plaintiff is capable of driving, but no more than half a mile. (AR., Doc. 13, p. 33) The pain in Plaintiff's legs allows her to stand for only 15 minutes before needing to sit down. She is only able to remain seated for 20-25 minutes before needing to stand again. (AR., Doc. 13, p. 33)

According to Plaintiff, her peripheral neuropathy causes her legs to cramp and her feet to swell, burn, and sting. (AR., Doc. 13, p. 37) As such, she is unable to shop for herself, climb stairs, lift heavy items, or stand for prolonged periods of time. (AR., Doc. 13, pp. 37-38) She is, however, able to care for her grandchild, help with his homework, prepare meals, and take care of the household cleaning chores in stages." (AR., Doc. 13, p. 38-40) According to Plaintiff, her DVT and peripheral neuropathy cause her to miss four or more days a month from work and prevent her from sustained gainful employment. (AR. Doc. 13, p. 38-40)

Plaintiff also testified that she has been diagnosed with bipolar disorder and depression. (AR., Doc. 13, p. 44) According to Plaintiff, Dr. McGowan referred her to a mental health care professional in 2011 and prescribes medications to control her depression, but she attended only one session with a mental health care provider and she does not take the medications prescribed

7

by Dr. McGowan because they "make [her] feel bad." (AR., Doc. 13, pp. 43-4) According to Plaintiff, antidepressants cause chest pains and makes her feel faint. (AR., Doc. 13, pp. 43-4)

Plaintiff also admitted that she smokes 1.5 packs of cigarettes per day and marijuana "about twice per month." (AR., Doc. 13, p. 41)

**C. Ruling of the ALJ**

On February 21, 2012, the ALJ released her unfavorable decision in regard to Plaintiff's DIB claim. (AR., Doc. 13, pp. 8-24) In consideration of Plaintiff's medical ailments, the ALJ reasoned that Plaintiff's "cervical dysplasia . . . elevated cholesterol and [] viral illness with myalgia . . . were not 'severe' under the meaning of the regulations" at step two of her analysis. (AR., Doc. 13, p. 12-13) According to the ALJ, "the viral illness" was the product of the stomach flu rather than Plaintiff's HIV, and, thus, "cannot be expected to last 12 months" as required by the regulations. (AR., Doc. 13, p. 12) Further, the ALJ found no evidence of symptoms related to Plaintiff's high cholesterol and cervical dysplasia, rendering those disorders non-severe. (AR., Doc. 13, pp. 12-13) According to the ALJ, "it is highly implausible that [high cholesterol] produces even minimal limitation of basic work functioning [and r]epeated PAP testing and other cervical diagnostic techniques showed no malignancy and, at most, mild dysplasia." (AR., Doc. 13, pp. 13-14)

In regard to Plaintiff's other ailments, at step 3 of her analysis, the ALJ reasoned that:

[t]he claimant testified that she has constant pain in her legs. She attributed this to her history of deep venous thromboses, but she also has peripheral neuropathy in her legs. She felt she could stand for about l5 minutes, sit for about 20-25 minutes (with her legs propped), and walk around the yard or for about five minutes. She said she has been HIV positive since 1997. She felt she could not hand[le] a job due to the pain in her legs, along about four absences a month due to her various medical conditions. She said she takes her grandchild to school. She does clean a little at a time. She watches television. She felt she could lift about ten pounds. She actually admitted that she smokes a little marijuana every month to help her

8

appetite. She said she has depression. She said she does not take medication for this anymore, because it made her feel bad.

Although it appears that the claimant has seen Dr. Catherine McGowan, M.D., of Vanderbilt's Comprehensive Care Clinic since 1997, Dr. McGowan's records do not commence until August 11, 2008. On that date, the claimant complained of about a month of nausea, vomiting, and anorexia. She also reported mild diarrhea. She had self-withheld her HIV ART medication because she felt it was making her vomit. She weighed 119 pounds. Her most recent testing, in December 2007, showed her viral load was below 48 and her CD4 count was 533. She felt much better on August 21, 2008. All of her symptoms had resolved and she was again adherent to medication. She gained back 11 pounds, and although she appeared lean and poorly nourished, she weighed 130 pounds. Staff noted her history of deep venous thrombosis with a hypercoagulative state. She was on 5mg Coumadin and her INR was 1.8. She was still doing well on November 13, 2008, weighing in at 126 pounds. Her INR dropped to 1.7, so on November 21, 2008, staff increased her Coumadin dosage to 6mg. She was still doing well on January 21, 2009, although she was grieving the sudden death of her brother. Hypercoagulability runs in her family, and she would later note two brothers having heart attacks within a few months of each other. However, at this time, her brother's death was not explained in her records. She did report fatigue, but she denied other common HIV symptoms like anorexia, fever, night sweats, or significant weight loss.

On April 30, 2009, the claimant was still doing well. She noted abdominal weight gain, and she was adherent to medications. However, she had self-decreased her Coumadin dosage because she saw stars and felt her blood was "too thin" on the 6mg dosage. Medical records indicated that the claimant's dosage remained at 5mg. The claimant weighed 129 pounds. Her INR level was subtherapeutic on May 14, 2009, but the 5mg dosage of Coumadin was continuing pending another subtherapeutic test result. However, when the medical provider wanted to perform additional testing on June 23, 2009, the medical provider could not reach the claimant. The claimant remained on the 5mg dosage through August 2009, and was on that dosage when she came for her next visit on October 1, 2009. She had no symptoms of easy bruising or bleeding. She had no some lower extremity pain. This had been helped by amitriptyline in the past, but for unknown reasons she was not on this medication. Otherwise, she was doing well and weighed 129 pounds.

On October 13, 2009, the claimant underwent psychological examination by senior psychological examiner Lisa Patterson, at the request of the State agency. The claimant told Ms. Patterson that she dropped out of school in the 11th grade because she "didn't want to be there" anymore. She had no GED. She claimed to need help reading and managing money. She reported that she spent her day cleaning up after the two boys, in reference to her mentally retarded son and her grandson, who were apparently living with her. She also said she prepared her own meals and watched a little television. Ms. Patterson observed that she "appear[ed] to be quite busy during the day taking care of her mentally retarded

son and seven-year-old grandson." The claimant primarily reported mood related symptoms like irritability and road rage. She did indicate that she is illiterate. She said she does not visit family, go to church, or have friends, but she did admit family comes to visit her. On examination, her concentration was below average. She solved simple addition and subtraction problems but could not perform multiplication or division. Ms. Patterson diagnosed her with a depressive disorder. She suggested the possibility of borderline intellectual functioning, but this was given only provisionally, and Ms. Patterson is not a source eligible to establish such a diagnosis in this context. She offered a global assessment of functioning score of 55-60, which is suggestive of moderate symptoms or limitations. She felt the claimant was mildly limited with regard to understanding and remembering. She felt the claimant's ability to concentration, persist, and sustain pace was adequate. She also felt the claimant's social interaction was within normal limits.

The claimant's INR was therapeutic on 5mg of Coumadin on November 10, 2009. On February 4, 2010, she came in accompanied by her husband. He was concerned the claimant was depressed, moody, and irritable with him, the kids, and their neighbors. The claimant also complained regarding her neuropathy. She weighed 135 pounds. Her INR was subtherapeutic on February 8, 2010, leading to an increase in her Coumadin dosage. She would continue to take 5mg, except on Monday, when she would take 7mg. This apparently represented a seven-percent increase. Her INR was back to therapeutic on March 9, 2010.

On March 21, 2011, Dr. McGowan noted how Lyrica had been helpful for her neuropathic pain in the past, so she was seeing a prescription assistance plan to help the claimant pay for it. The claimant was doing well during an April 8, 2011 follow up visit. She was fully adherent to her HIV medications. She was smoking, despite her hypercoagulability. She complained of fatigue but no other common HIV symptoms. Her viral load had been 48 in December. Dr. McGowan noted good control of her neuropathy with Lyrica. She had full range of motion in all joints, normal neurological findings, and normal gait. She was doing well with a continued normal examination on July 3, 2011, although she was morning the recent death of a nephew. Dr. McGowan noted excellent sustained response to ART in reference to her HIV. On July 15, 2011, her Coumadin dosage was producing a therapeutic INR. On July 29, 2011, Dr. McGowan wrote a letter stating that the claimant's neuropathy was painful and interfered with her standing, gait, and physical stamina. The claimant was apparently very ill on August 23, 2011, but initially refused to go to the emergency room. She was eventually convinced to go to Vanderbilt's emergency room, where Dr. Gary Schwartz, M.D., and other staff realized she had "stomach flu" and treated her accordingly. Dr. Schwartz noted that she had excellent CD4 counts and an undetectable viral load. This was echoed in earlier treatment records, such as when she was noted to be at her ART treatment goal on July 8, 2011, with a viral load below 48 and a CD4 level of 682. The last treatment record on file showed that she still had a cough following her acute illness in August 25, 2011, but she also admitted to smoking 1.5 packs of cigarettes each day, and noting she had smoked since age 16.

(AR., Doc. 13, pp. 16-18)

> From this analysis, the ALJ found:
>
> The claimant's records show her HIV has experienced excellent response to ART therapy. She commonly denies most HIV symptoms other than fatigue. She does not have regular diarrhea or vomiting, despite a few scattered episodes. Her CD4 counts are good and her viral load is undetectable. While HIV is a very serious illness, it appears that the claimant's symptoms are managed quite well with treatment. Her neuropathy is also managed well with treatment on Lyrica, according to specific statements in Dr. McGowan's treatment records, regardless of what her July 2011 letter may suggest. The claimant does have issues with coagulation; however, she has not had a recurrent blood clot during the period covered by the available medical records. Her INR has largely been therapeutic during the relevant period. And, Dr. McGowan's records show normal gait. There is scattered mention of mental illness, but she has not received any treatment from a mental health specialist. The claimant does not report serious symptoms like suicidal ideation, hallucinations, or delusions. She cares for two individuals and manages to complete basic household tasks.

(AR., Doc. 13, p. 18)

## III. ANALYSIS

### A. Standard of Review

The District Court's review of the Commissioner's denial of DIB is limited to a determination of whether those findings are supported by substantial evidence and whether correct legal standards were applied. 42 U.S.C. § 405(g); *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). A finding of substantial evidence does not require all the evidence in the record to preponderate in favor of the ALJ's determination, but does require more than a mere scintilla of support for a denial of DIB. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

The ALJ's determination is entitled to deference where "a reasonable mind might accept [evidence in the record] as adequate to support" the ALJ's determination even though it could also support a different conclusion. *Rogers*, 486 F.3d at 241; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). "[F]ailure to follow the rules" promulgated to control the process of benefit determination "denotes a lack of substantial evidence, even where the ALJ's"

determination is otherwise supportable. *Cole*, 661 F.3d at 937 (*quoting Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009)).

**B. Assignments of Error**

Plaintiff asserts that, as a treating physician, Dr. McGowan's opinion of Plaintiff's impairments "should have been given controlling weight." (Plaintiff's Motion for Judgment on the Administrative Record ("Pl. Motion"), Doc. 19, p. 7) Further, Plaintiff alleges that the ALJ either did not consider all of her impairments or minimized those impairments in her consideration of Plaintiff's claims. (Pl. Motion, Doc. 19, pp. 7-9) Lastly, Plaintiff asserts that the ALJ did not properly assess Plaintiff's credibility. (Pl. Motion, Doc. 19, pp. 10-12)

(1) *Dr. McGowan's Opinion is not Entitled to Controlling Weight*

On July 29, 2011, Dr. McGowan opined that Plaintiff "is severely limited by her multiple chronic medical problems and unable to sustain gainful employment." (AR., Doc. 13, p. 277) The ALJ "reject[ed] Dr. McGowan's [opinion] because Dr. McGowan asserted that claimant's neuropathy interferes with her standing, gait, and physical stamina, but failed to document how it interfered, or to what extent." (AR., Doc. 13, p. 18) According to the ALJ, "Dr. McGowan's treatment records show the claimant's neuropathy is manageable with Lyrica, [] that the claimant has normal gait[, and that] Dr. McGowan's statement that the claimant is unable to sustain gainful employment is a matter reserved for the Commissioner." (AR., Doc. 13, p. 18)

"Treating-source opinions must be given controlling weight″ if two conditions are met: (1) the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques″; and (2) the opinion is not inconsistent with the other substantial evidence in [the] case record.″ *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)). In assessing the weight afforded to the opinion of a treating physician,

the ALJ must first make a finding that the opinion is or is not entitled to controlling weight. *Id.* at 376. "If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence." *Id.* at 375 (citing 20 C.F.R. §§ 404.1527(c)(2)-(6)).

At the outset, the Magistrate Judge notes that the ALJ did not strictly follow the rules promulgated to govern the weight afforded to Dr. McGowan's opinion as outlined above. However, to reverse and remand on those grounds here "would raise form over function, to the detriment of the" Commissioner, *United States v. Amawi*, 695 F.3d 457, 472 (6th Cir. 2010), and "convert judicial review of an agency action into a ping pong game." *Wilson v. Comm'r fo Soc Sec.*, 378 F.3d 541, 547 (6th Cir. 2006) (quoting *NLRB v. Wyman-Gordon*, 394 U.S. 759, 766 n.6 (1969)). It is clear from the ALJ's analysis of the medical evidence that she clearly contemplated the contrary nature of Dr. McGowan's ultimate opinion to that of her own medical notes and other objective medical evidence.

It is also clear from the record that Dr. McGowan's "opinion is so patently deficient that the Commissioner could not possibly credit it [and that] the Commissioner ultimately met the goal of" the regulation despite having not strictly complied with it. *Id.* As noted *supra* at pp. 3-4, Dr. McGowan's own exam notes clearly demonstrate that Plaintiff responded well to Lyrica, consistently denied complaints of joint pain, experienced no impairment in her range of motion or loss of strength in her lower extremities, and was able to engage in all activities of daily living without aid. As such, Dr. McGowan's records demonstrate a complete lack of evidence to support her opinion that neuropathy impaired Plaintiff's gait or mobility to any degree. This is so

both before Dr. McGowan opined that Plaintiff is severely impaired as well as afterward. As such, the ALJ's failure to strictly comply with treating physician rule here is harmless. Substantial evidence supports the ALJ's decision to reject Dr. McGowan's opinion because it is contrary to *all* objective medical evidence of record.

(2) ***The ALJ Properly Considered All of Plaintiff's Impairments***

Plaintiff argues that the ALJ "erred when she minimized the severity of the claimant's" ailments. (Pl. Motion, Doc. 13, pp. 7-8) The Commissioner responds that the ALJ gave full consideration to Plaintiff's maladies, but Plaintiff failed in her duty to prove her case. (Response to Plaintiff's Motion for Judgment on the AR, Doc. 22, p. 9)

As the Commissioner aptly notes, "[t]he claimant bears the burden of proof" that her impairments impose a severe limitation upon her ability to engage in substantial gainful activity. *Wilson*, 378 F.3d at 548. To substantiate entitlement to DIB under the SSI, a claimant must demonstrate "a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(a)(1)(E), (d)(1)(A).

Determination of a "disability" under the SSA's rules requires a five-step sequential assessment of whether: 1) a claimant has engaged in substantial gainful activity during the period under consideration; 2) the claimant has a severe medically determinable physical impairment that significantly limits his ability to do basic work activities; 3) the claimant has a severe impairment that meets or equals one of the listings in Appendix I Subpart P of the regulations and meets the durational requirements; 4) the claimant's impairment prevents him from doing her past relevant work; and, if so, 5) whether the claimant can transition to other work under the RFC. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), (b)-(g). If the ALJ determines that the medical evidence demonstrates a

"medically determinable mental impairment" at step two of the process, he must then, at step three, determine how the mental impairment "interferes with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. §§ 404.1520a(b)(1).

After a thorough consideration of the record and the opinions of the medical professionals to opine on Plaintiff's medical impairments, the ALJ found that Plaintiff's ailments do not impose a severe limitation upon her. As clearly detailed above, Plaintiff's peripheral neuropathy did not impair Plaintiff's gait, mobility, or motor strength and she was fully capable of performing her activities of daily living unassisted. Further, despite complaints of worsening neuropathy and pain in February of 2010, Dr. McGowan's medical notes demonstrate that the condition was "well controlled with Lyrica" and Plaintiff continually denied pain in her extremities as late as September of 2011. (AR., Doc. 13, p. 284)

As the ALJ also noted, Plaintiff's "Coumadin dosage was producing a therapeutic INR" in July of 2011 and Plaintiff consistently denied easy bruising or bleeding while her Coumadin levels remained so. (AR., Doc. 13, pp. 17-18, 226-28, 230, 234) In regard to Plaintiff's hypercholesterolemia or hyperlipidemia, the record demonstrates that this condition was well controlled with "Zetia and Lipitor" as noted *supra* at p. 3. Further, as the ALJ found, the record indicates no "symptoms of this condition." (AR., Doc. 13, p. 13) Likewise, as the ALJ also found, Plaintiff's "cervical dysplasia is documented, but primarily as historical. Repeated PAP testing and other cervical diagnostic techniques showed no malignancy and, at most, mild dysplasia. Some tests were even negative for dysplasia." (AR., Doc. 13, p. 14) Indeed, the record demonstrates consistently normal PAP smears as late as September 21, 2011. (AR., Doc. 13, pp. 232, 239, 241, 244, 246, 283, 335)

While Plaintiff frequently reported mild diarrhea, the viral infection referred to in August of 2011 was clearly a case of the "stomach flu" according to the emergency room discharge notes. (AR., Doc. 13, p. 301) As of September 21, 2011, Plaintiff's nausea and the diarrhea had resolved. (AR., Doc. 13, p. 281) Thus, this viral infection "is not a chronic illness. It cannot be expected to last 12 months, and thus cannot be a "severe" impairment under the Regulations" as the ALJ found. (AR., Doc. 13, p. 13) In regard to Plaintiff's HIV infection, while the record reflects that Plaintiff consistently reported mild diarrhea, the record also reflects that she consistently "denied other common HIV symptoms like anorexia, fever, night sweats, or significant weight loss" as the ALJ found. (AR., Doc. 13, pp. 16, 228, 231, 238, 240, 245, 247, 281, 321, 355) Further, Plaintiff experienced "excellent sustained response to ART [for treatment of] her HIV." (AR., Doc. 13, p. 17) Plaintiff's immune system was "robust" in July of 2011, and the August 25, 2011 treatment notes from Vanderbilt Hospital indicate that she historically maintained "excellent CD4 counts and undetectable viral loads." (AR., Doc. 13, p. 321)

Lastly, Plaintiff asserts that the ALJ "failed to consider the debilitating effects of [Plaintiff's] mental disorder of bipolar disorder and functional illiteracy." (Pl. Motion, Doc. 19, p. 8) Contrary to Plaintiff's claims, the ALJ considered Plaintiff's illiteracy and bipolar disorder at length. At the time of her claim to DIB, Plaintiff was "receiving treatment for bipolar disorder and is functionally illiterate" as the ALJ found (AR., Doc. 13, p. 19), but "ha[d] not been seen [by her treating physician] since November 2010, and ha[d] not been seen long enough to make a [disability] determination." (AR., Doc. 13, p. 332) Despite being referred to a mental health provider, Plaintiff failed to seek that treatment and declined to take the depression medication prescribed to her because "of the way it makes [her] feel." (AR., Doc. pp. 44-5) As such, the ALJ properly relied upon the opinions of the State Agency examining and reviewing consultants.

As the ALJ noted at length, Ms. Patterson, the State Agency psychological examiner, found Plaintiff's performance during testing to reveal that Plaintiff's "ability to understand and remember [is] mildly limited, . . . her ability to sustain concentration appeared adequate during testing, . . . [h]er social skills were within normal limits, [and] her adaptive skills appear to be within normal limits." (AR., Doc. 13, p. 204) The only limitation noted by Ms. Patterson is Plaintiff's illiteracy and inability to manager her funds, which the ALJ clearly found to be the case. (AR., Doc. 13, pp. 17, 204) And, as the Commissioner argues, the ALJ specifically found Plaintiff to be illiterate (AR., Doc. 13, p. 19), and included illiteracy in each of the hypotheticals presented to the VE.[11] (AR., Doc. 13, pp. 48-54)

Further supporting ALJ's findings are the opinions of State Agency Psychologists which were afforded "great weight . . . because they support Ms. Patterson's assessment and are consistent with the record as a whole." (AR., Doc. 13, p. 18) According to Dr. de la Torre, Plaintiff's ability to: 1) understand questions and directions; 2) care for herself and her grandchild; 2) perform activities of daily living unassisted; 3) sustain attention for prolonged periods of time; and 4) her ability to help her grandson with his homework suggest at most "moderate limitations in basic work-like duties." (AR., Doc. 13, p. 219) Dr. Neilson affirmed Dr. De la Torre's assessment four months later, even in consideration of Plaintiff's "allege[d] worsening of symptoms." (AR., Doc. 13, p. 275)

Thus, contrary to Plaintiff's claims, the ALJ's consideration of Plaintiff's medical and mental ailments was both thorough and supported by substantial evidence.

(3) ***The ALJ Properly Determined that Plaintiff's Testimony was only Partially Credible***

---

[11]  Although Plaintiff does not specifically raise the RFC finding made by the ALJ and the VE's testimony regarding the jobs available to Plaintiff in the national as well as Tennessee market, the Magistrate Judge finds that the VE noted a full range of jobs that Plaintiff could engage in that are present in sufficient numbers within both economies. (AR., Doc. 13, pp. 47-53) The jobs available to Plaintiff included "cleaner, hospital" which was within her prior work history. (AR., Doc. 13, p. 47)

17

In her last assignment of error, Plaintiff asserts that the ALJ failed to properly assess Plaintiff's credibility. (Pl. Motion, Doc. 19, pp. 10-12) According to Plaintiff, the ALJ impermissibly detracted from her credibility by focusing upon her limited activities of daily living to the exclusion of the medical evidence and other factors mandated by 96-7P. (Pl. Motion, Doc. 19, p. 11-12) However, as the Commissioner asserts, "the entirety of the ALJ's RFC analysis [] constitute[s] support of the ALJ's credibility assessment." (D. Response, Doc. 22, p. 18)

Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." *Rogers*, 486 F.3d at 247. As the Commissioner asserts, that is precisely what the ALJ did here. After summarizing Plaintiff's testimony, the ALJ performed a thorough analysis of how Plaintiff's testimony was belied by the record as a whole. According to the ALJ, despite Plaintiff's testimony that her medical impairments prevent her from working,

> the claimant's records show her HIV has experienced excellent response to ART therapy. She commonly denies most HIV symptoms other than fatigue. She does not have regular dia[rr]hea or vomiting, despite a few scattered episodes. Her CD4 counts are good and her viral load is undetectable. While HIV is a very serious illness, it appears that the claimant's symptoms are managed quite well with treatment. Her neuropathy is also managed well with treatment on Lyrica, according to specific statements in Dr. McGowan's treatment records, regardless of what her July 2011 letter may suggest. The claimant does have issues with coagulation; however, she has not had a recent blood clot during the period covered by the available medical records. Her INR has largely been therapeutic during the relevant period. And, Dr. McGowan's records show normal gait. There is scattered mention of mental illness, but she has not received any treatment from a mental health specialist. The claimant does not report serious symptoms like suicidal ideation, hallucinations, or delusions. She cares for two individuals and manages to complete basic household tasks.

(AR., Doc. 13, p. 18)

In addition to the thorough analysis performed by the ALJ, the Magistrate Judge also notes that Plaintiff's testimony was somewhat inconsistent with the medical record. For example, Plaintiff testified that her feet swell, burn, sting, and hurt perpetually, but repeatedly denied reports of lower extremity pain (AR., Doc. 13, pp.226-28, 230, 234, 236-38, 240, 245, 345, 355, 258, 404, 411), and showed no signs of edema. (AR., Doc. 13, pp. 229, 232, 239, 241, 246, 248, 284, 321, 356) Further, despite her testimony that she receives marijuana from her friends approximately "twice a month" (AR., Doc. 13, pp. 41, 43), there is evidence in the record that it is her siblings that provide the marijuana on three or four occasions per week. (AR., Doc. 13, pp. 202, 344, 359, 410)

As such, the Magistrate Judge finds the ALJ's credibility determination regarding Plaintiff to be supported by substantial evidence.

## IV. <u>CONCLUSION</u>

For the above stated reasons, the Magistrate Judge finds the ALJ's decision to deny controlling weight to the opinion of Dr. McGowan, the ALJ's consideration of Plaintiff's medically diagnosable physical and mental ailments, and the ALJ's credibility determination regarding Plaintiff's testimony to be supported by substantial evidence.

## V. <u>RECOMMENDATION</u>

The undersigned recommends that the plaintiff's motion for judgment on the record (Doc 18) be **DENIED** and the decision of the ALJ **AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt

19

of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 16th day of June, 2014.

/s/Joe B. Brown
Joe B. Brown
Magistrate Judge